IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| KATHLEEN G. RAINEY, | ) | Case No. 4:21-cv-01335 |
| | ) | |
| Plaintiff, | ) | JUDGE PAMELA A. BARKER |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND** |
| Defendant. | ) | **RECOMMENDATION**[1] |

Plaintiff, Kathleen G. Rainey, seeks judicial review of the final decision of the Commissioner of Social Security, denying her application for disability insurance benefits ("DIB") under Title II of the Social Security Act.  The Administrative Law Judge's ("ALJ") decision on review comes following a previous remand for reconsideration of Rainey's fibromyalgia.  Rainey challenges the ALJ's negative findings on remand, arguing that the ALJ misevaluated the opinion evidence and her subjective fibromyalgia pain symptoms.  Rainey has not established a basis for remand on account of the ALJ's evaluation of the opinion evidence. However, because the ALJ failed to apply proper legal standards in explaining why he discounted Rainey's subjective fibromyalgia pain symptoms, I recommend that the Commissioner's final decision denying Rainey's application for DIB be vacated and that Rainey's case be remanded for further consideration.

---

[1] This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b).

## I.        Procedural History

On February 23, 2016, Rainey reapplied for DIB.[2]  (Tr. 167).[3]  Rainey alleged that she

became disabled on December 7, 2013 due to: "1. depression; 2. fibromyalgia; 3. carpal tunnel;

4. restless legs; 5. bul[]ging disk; 6. arthritis; 7. flat foot; [and] 8. memory loss."  (Tr. 167, 185).

The Social Security Administration denied Rainey's application.  (Tr. 80-89).  Rainey requested

an administrative hearing.  (Tr. 98).

ALJ Wayne Stanley heard Rainey's case on February 6, 2018 and denied the claim in a

July 9, 2018 decision.  (Tr. 654-712).  In doing so, the ALJ determined that Rainey's

fibromyalgia was a non-severe impairment at Step Two yet gave great weight to the opinion of

the state agency consultant, who determined that the impairment *was* severe.  (Tr. 703-04, 710).

On July 17, 2019, the Appeals Council denied further review.  (Tr. 717-19).

On September 20, 2019, Rainey filed a complaint to obtain judicial review in the Western

District of Pennsylvania and the parties cross-moved for summary judgment.  CM/ECF for U.S.

Dist. Ct. for W.D. Penn., case no. 2:19-cv-01197, docs. 4, 10, 12.  On October 8, 2020, the court

granted summary judgment in favor of Rainey, vacated the ALJ's July 9, 2018 decision, and

remanded the case for further proceedings.  (Tr. 730-31).  The court determined that the ALJ

erred by failing to articulate the reason for the disparity between his Step Two and Step Four

findings with respect to the severity of Rainey's fibromyalgia impairment.  (Tr. 727).  The court

further determined that the error was not harmless because the ALJ's discussion of Rainey's

fibromyalgia impairment was "scant," such that the Step Two error might have affected the

---

[2] Rainey originally applied for DIB on April 10, 2012, with an alleged onset date of June 30, 2011.  ECF Doc. 12 at 746.  That claim was denied in a December 6, 2013 decision.  ECF Doc. 12 at 750.  Neither party disputes that the relevant period under adjudication for Rainey's current petition is from December 7, 2013 to the date last insured (September 30, 2015).  *See generally* ECF Doc. 13; ECF Doc. 14.
[3] The administrative transcript appears in ECF Doc. 12.

ALJ's analysis at later steps. (Tr. 728). The court also pointed out that the ALJ's rejection of Rainey's subjective pain symptoms partly because of her conservative treatment was "troubling" in light of district precedent noting the importance of a claimant's subjective complaints and the appropriateness of conservative treatment in fibromyalgia cases. (Tr. 728-29).

On January 19, 2021, the Appeals Council issued a remand order pursuant to the district court's decision. (Tr. 734). ALJ Stanley held a second hearing on May 4, 2021 and denied her claim in a May 13, 2021 decision. (Tr. 601-10, 616-53). In doing so, the ALJ determined at Step Two that Rainey's fibromyalgia *was* a severe impairment. (Tr. 603). At Step Four, the ALJ determined that Rainey had the residual functional capacity ("RFC") to perform light work, except that "she could not climb ladders, ropes, or scaffolds, and could only occasionally balance, stoop, kneel, crouch, crawl, and climb ramps and stairs." (Tr. 606).

Based on vocational expert testimony that someone with Rainey's age, experience, and RFC could work in such representative occupations as cashier, ticket taker, and laundry folder, the ALJ determined that Rainey was not disabled. (Tr. 609-10). Rainey did not seek Appeals Council review, rendering the ALJ's decision the final decision of the Commissioner. *See* 20 C.F.R. § 416.1484(d) (stating that the ALJ's decision on remand becomes the final decision of the Commissioner if the claimant does not file exceptions disagreeing with the ALJ's decision). On July 12, 2021, Rainey filed a complaint to obtain judicial review. ECF Doc. 1.

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Rainey was born on February 28, 1962, and she was 51 years old on the alleged onset date and 53 years old on the date last insured (September 30, 2015). (Tr. 167, 603). Rainey completed high school in 1980 and had no specialized or vocational training. (Tr. 186). Rainey

had prior work as a cafeteria aid, dietary aid, and warehouse supervisor, which the ALJ determined she was unable to perform.  (Tr. 186, 609).

### B.    Relevant Medical Evidence[4]

On January 17, 2014, Rainey visited Warren Rogers, MD, for a medication check, reporting pain in her lower back rated at 5/10.  (Tr. 287).  Rainey's medical history included a prior back injury, arthritis, and fibromyalgia.  (Tr. 288).  And she was observed to ambulate with a cane.  (Tr. 289).  Dr. Rogers prescribed nortriptyline to treat, among other things, her chronic pain.  (Tr. 290).

On February 27, 2014, Rainey reported to Dr. Rogers that nortriptyline wasn't effective at treating her pain, which she rated at 6/10.  (Tr. 283).  Rainey also displayed "[p]ain behavior with ambulation."  (Tr. 285).  Rainey stated she was hesitant to increase her medication dosage because of weight gain.  (Tr. 284).  After discussing alternative medication treatment options, Dr. Rogers discontinued nortriptyline and prescribed Cymbalta.  (Tr. 286).

On March 13, 2014, Rainey reported to Dr. Rogers that, despite improvement in her mental health symptoms, she still had "significant pain."  (Tr. 278-79).  Rainey reported pain in her shoulders to lower back rated at 6/10.  (Tr. 279).  She also reported blurry vision and displayed "[p]ain behavior."  (Tr. 279-80).  Dr. Rogers continued Rainey's medication treatment, noting that he was hesitant to increase the dosage because of "her conflicting genetic interactions."  (Tr. 280-81).

On June 12, 2014, Rainey visited Dr. Rogers for a follow-up, reporting lower extremity pain rated at 7/10.  (Tr. 273-74).  Rainey stated that she had been prescribed Neurontin and

---

[4] Rainey contests only the ALJ's RFC determination as it pertains to limitations resulting from her physical impairments.  My summary of the relevant medical evidence, therefore, omits Rainey's mental health treatment records.  *See generally* ECF Doc. 13.

Vicodin by other providers.  (Tr. 274).  Rainey stated that her pain was "being held by the Cymbalta although she still requires some Vicodin."  *Id.*  Dr. Rogers noted that Rainey was "comfortable with her medications 'as is'" and continued her medication treatment.  (Tr. 276).  During a December 11, 2014 follow-up, Rainey reported shoulder pain rated at 6/10 but stated that she was "pleased" with her medication treatment "as is."  (Tr. 269-71).

On November 18, 2014, Rainey visited Horizon Greenville Orthopedics, reporting aching pain, numbness, and tingling in her hands.  (Tr. 558-59).  Rainey reported that she'd had an EMG study two years earlier that was positive for carpal tunnel syndrome.  (Tr. 559, 564).  Rainey stated that she'd used anti-inflammatory medication and night splints over the years, but they no longer provided relief.  *Id.*  Rainey also reported that her numbness mostly manifested after activities or in the evening while she slept, and she reported difficulty carrying objects and turning knobs.  (Tr. 559-60).  Rainey told the attending physician that she wanted to defer conservative treatment and instead wanted surgical intervention.  (Tr. 559).  On physical examination, Rainey had a positive Phalen's and Tinel's sign tests and diminished sensation.  *Id.*  Rainey also had full wrist range of motion, negative Allen's sign test, "good" grip and pinch strength, and unremarkable x-ray results.  (Tr. 559, 591-92).

On December 23, 2014, Rainey returned to Horizon Greenville Orthopedics in connection with her hand pain.  (Tr. 564).  Her physical examination results were similar to her November 18, 2014 visit.  (Tr. 567).  The attending physician's assistant diagnosed Rainey with carpal tunnel syndrome and scheduled surgery.  *Id.*  On January 21, 2015, Rainey underwent a decompression of the right median nerve at the wrist.  (Tr. 572-73).

On February 5, 2015, Rainey visited Horizon Greenville Orthopedics for a follow-up on her surgery, reporting "great improvement of her presurgical symptoms."  (Tr. 574).  With the

exception of the index finger, Rainey denied numbness and tingling.  *Id.*  On physical examination, Rainey had mild edema, tenderness, and decreased range of motion at the wrist secondary to pain.  *Id.*

On April 2, 2015, Rainey visited Edward Uberti, DO, for a follow-up on her surgery, reporting that she continued to have numbness and tingling in the small and ring fingers.  (Tr. 579).  Rainey stated that her numbness seemed worse since surgery but was unsure whether she perceived it worse now that her other fingers weren't numb.  *Id.*  She also reported trouble grabbing things and shooting pain.  (Tr. 580).  On physical examination, Rainey had "excellent" range of motion and negative Tinel's and Phalen's sign test results of the median nerve.  *Id.* However, Rainey had mildly positive Tinel's sign test results at the elbow and her elbow flexion was "mild to moderately positive for numbness and tingling in the small and ring fingers."  *Id.* Dr. Uberti ordered an EMG study, noting that Rainey's symptoms might display signs of cubital tunnel syndrome.  *Id.*

On April 28, 2015, Rainey returned to Dr. Uberti following her EMG study, which did not show evidence of ulnar neuropathy.  (Tr. 584, 595-96).  Rainey reported that her pain was worse at night and woke her up frequently, but her fibromyalgia also woke her up at night.  (Tr. 584).  Dr. Uberti stated that although the EMG study was negative, Rainey's clinical signs showed evidence of ulnar neuropathy: positive Tinel's sign test over the Guyon's canal and mildly increased numbness and tingling in the small finger with elbow flexion.  *Id.*  In lieu of a diagnostic injection, Rainey elected to try a night splint to help diagnose Guyon's canal entrapment of the ulnar nerve.  (Tr. 585).

On May 7, 2015, Rainey visited Dr. Rogers, reporting that she was "doing well" on Cymbalta and satisfied with her medication.  (Tr. 264-65).  Rainey also reported whole-body pain rated at 5/10 and displayed "[d]ecreased pain behavior."  (Tr. 265-66).

On June 4, 2015, Rainey visited Kate Paylo, DO, reporting low back pain that radiated into her right thigh.  (Tr. 368).  Rainey described the pain as "aching, miserable, and unbearable in nature," which she rated at 9/10 at its worst and 4/10 at its best.  *Id.*  Rainey stated that her pain was accompanied by leg weakness, relieved with heat and medication, and aggravated by activity.  *Id.*  She also reported widespread pain secondary to fibromyalgia syndrome.  *Id.*  Upon physical examination, Rainey had paraspinal muscle spasms and tenderness, pain with facet loading and flexion of the lumbar spine, and obesity.  (Tr. 370).  Dr. Paylo stated that a review of Rainey's past imaging test showed: (i) mild degenerative changes of the cervical spine; (ii) degenerative disc disease and mild scoliosis; and (iii) minimal posterior disc bulging at L23 and L34.  (Tr. 368).  After discussing different treatment options, Rainey elected multidisciplinary pain management, consisting of aquatic therapy and block injections.  (Tr. 370-71).

Rainey received lumbar medial branch block injections on June 17, 2015, July 1, 2015, and July 22, 2015, with 30%, 40%, and 0% post-injection relief, respectively.  (Tr. 359-66).  Meanwhile, she received hydrocodone-acetaminophen, Cymbalta, gabapentin, and baclofen refills from Stanislav Byshenko, MD.  *See* (Tr. 427, 448).

On August 11, 2015, Rainey reported to Dr. Byshenko that she had pain in the left side of her neck and shoulder that had begun three days earlier.  (Tr. 394).

On August 13, 2015, Rainey returned to Dr. Paylo, reporting that her most recent injection only increased her back pain.  (Tr. 355).  She also reported, however, that her pain was

"controlled" with her current medication.  *Id.*  On physical examination, Rainey had unremarkable results except positive left-sided facet loading and FABER tests and tenderness of the left lumbar segments and sacroiliac joint.  (Tr. 356-57).  Dr. Paylo recommended a radiofrequency ablation and sacroiliac joint injection and encouraged Rainey to continue exercise and aquatic therapy.  (Tr. 357).

On September 11, 2015, Rainey reported to Dr. Byshenko for medical refills.  (Tr. 391).  She did not have "acute complaints" but reported chronic back and leg pain.  (Tr. 391-92).  During an October 9, 2015 follow-up, Rainey reported lower back pain.  (Tr. 388-89).

On October 22, 2015, Rainey returned to Dr. Paylo, reporting that she "continues to note improved quality of life as well as improved level of function with the current medication regiment."  (Tr. 351).  However, Rainey also reported pain rated at 6/10.  (Tr. 352).  On physical examination, Rainey had paraspinal muscle spasms and tenderness, pain with facet loading and flexion of the lumbar spine, and obesity.  (Tr. 352-53).  Dr. Paylo did not provide medication and noted that Rainey was not interested in interventional procedures at the time.  (Tr. 353).

On November 23, 2015, Rainey established care with Robin Molaskey, MD.  (Tr. 547).  Rainey reported chronic low back pain with radicular symptoms down to her knees.  *Id.*  She also reported that she did not respond to physical therapy treatment and never attended aquatic therapy.  (Tr. 548).  On physical exam, Rainey had joint and generalized lumbosacral tenderness, "acutely positive" straight leg raise test, and decreased reflexes.  (Tr. 547-48).

On December 14, 2015, Rainey reported to Dr. Molaskey that her insurance would not approve aquatic therapy unless she travelled to Pittsburg, Pennsylvania.  (Tr. 545).  She also reported pain in her back and right hip rated at 6-7/10.  *Id.*  She stated that gabapentin was "helping significantly."  *Id.*  On physical examination, Rainey had decreased lumbar range of

motion and generalized lumbar tenderness.  (Tr. 546).  Dr. Molaskey prescribed hydrocodone-acetaminophen.  *Id.*

On January 11, 2016, Rainey reported to Dr. Molaskey that she had lower back and shoulder pain, rated at 6/10.  (Tr. 543).  On physical examination, she had decreased cervical and lumbar range of motion and tenderness in both areas.  (Tr. 543-44).  Dr. Molaskey refilled her hydrocodone-acetaminophen prescription.  (Tr. 544).

On February 8, 2016, Rainey reported to Dr. Molaskey that she had back pain with tingling sensation in her right shin.  (Tr. 541).  Rainey rated her pain at 7/10.  *Id.*  On physical exam, Rainey had decreased lumbar range of motion, generalized tenderness over the lumbar region, and point tenderness over the sacroiliac joints.  (Tr. 541-42).  Dr. Molaskey refilled her prescriptions.  (Tr. 542).

On March 7, 2016, Rainey reported to Dr. Molaskey that she had been "doing very well with current therapy" and "has been able to increase her level of activity considerably."  (Tr. 539).  She also reported back pain rated at 5/10.  *Id.*  On physical examination, Rainey had decreased lumbar range of motion and generalized lumbosacral tenderness.  (Tr. 539-40).  Dr. Molaskey refilled Rainey's prescriptions.  (Tr. 540).

On April 4, 2016, Rainey reported to Dr. Molaskey "significant" low back pain that radiated to her lower extremities, which she rated at 7/10.  (Tr. 537).  On physical examination, Rainey appeared in moderate pain/distress and had "[e]xquisite tenderness" in the lower back which increased with extension and rotation.  (Tr. 538).  She also had positive straight leg raise test results.  *Id.*  Dr. Molaskey recommended diagnostic medial nerve branch blocks, but Rainey was hesitant.  *Id.*  Dr. Molaskey refilled her prescriptions.  *Id.*

On April 29, 2016, Rainey reported to Dr. Molaskey that she had pain rated at 7/10 in her low back that radiated to her right knee.  (Tr. 535).  On physical examination, Rainey appeared moderately distressed and had right sides back pain that increased with extension and rotation.  (Tr. 535-36).  Dr. Molaskey refilled her prescriptions.  (Tr. 536).

On May 27, 2016, Rainey reported to Dr. Molaskey with left hip pain.  (Tr. 533).  She also reported back pain rated at 5/10.  *Id.*  On physical examination, Rainey had decreased range of motion and tenderness over the left sacroiliac joint.  (Tr. 534-35).  Dr. Molaskey refilled her prescriptions.  (Tr. 534).

On June 29, 2016, Rainey reported to Dr. Molaskey with low back pain that radiated down her right lower extremity, which she rated at 6/10.  (Tr. 531).  On physical examination, Rainey appeared in moderate pain/distress and had decreased range of motion and positive right straight leg raise test results.  (Tr. 531-32).  Dr. Molaskey refilled her prescriptions.  (Tr. 532).

### C.    Relevant Opinion Evidence

#### 1.    Treating Source, Robin Molaskey, MD

On June 29, 2016, Dr. Molaskey completed a medical source statement on Rainey's functional limitations.  (Tr. 463-64).  Dr. Molaskey opined that Rainey could: (i) occasionally lift/carry up to 10 pounds due to her low back pain with radiculopathy; (ii) walk up to 3 hours in an 8-hour workday and only up to 15 minutes without interruption due to her back and leg pain; (iii) sit for up to 3 hours in an 8-hour workday and only up to 1 hour without interruption; (iv) occasionally climb, stoop, crouch, and kneel and never crawl or balance due to lumbar radiculopathy; and (v) work in a "low stress job."  *Id.*  Dr. Molaskey further opined that Rainey would be prevented from attending work between two and four days per month and that Rainey had reaching and pushing/pulling limitations.  *Id.*

10

### 2. State Agency Consultant

On April 21, 2016, Diane Fox, MD, evaluated Rainey's physical capacity based on a review of the medical record and determined that Rainey had the RFC to perform light work. (Tr. 85-87). Dr. Fox determined that Rainey could: (i) occasionally lift 20 pounds and frequently lift 10 pounds; (ii) stand/walk/sit 6 hours in an 8-hour workday; (iii) occasionally stoop and climb ladders/ropes/scaffolds; and (iv) frequently balance, kneel, crouch, crawl, and climb ramps/stairs. (Tr. 85-86). In explaining her findings, Dr. Fox stated that her opinion reflected Rainey's "current function" in addition to her functioning on the date last insured. (Tr. 86-87).

### D. Function Report

On March 21, 2016, Rainey prepared a function report. (Tr. 193-200). Rainey stated that because of her back pain she could not stand for long periods of time and needed to take breaks. (Tr. 193). Rainey stated her back pain radiated down her legs with prolonged walking, sitting, and standing. *Id.* Rainey stated that the maximum she could walk was half a mile and she needed to rest for 15 minutes before continuing. (Tr. 198). She also stated that she used a cane for prolonged walking. (Tr. 199). Because of her carpal tunnel syndrome, Rainey stated that her hands would go numb. (Tr. 193). Rainey also reported arm weakness when holding objects due neck and shoulder pain. *Id.* Rainey stated that the most she could lift was ten pounds. (Tr. 198).

Rainey reported that her day consisted of taking medication, applying heat to her back, doing chores around the house, taking breaks, applying more heat, taking walks, and watching television. (Tr. 194). Rainey reported that she cared for her husband and granddaughter with assistance from her son. *Id.* She stated that her son helped by carrying laundry baskets up and down stairs, cooking, and cleaning. *Id.* She reported that she cared for a turtle by feeding it and cared for a dog by feeding and walking it, noting that she did so with assistance. *Id.*

11

Rainey reported that her impairments did not affect her ability to feed herself but she: (i) needed to sit to dress and shave her legs; (ii) needed her husband's assistance to get out of the bathtub; (iii) and could not raise her hands above her head for long periods of time to do her hair. *Id.*  Rainey stated that she could prepare sandwiches, hotdogs, and hamburgers but could not stand and make "complete meals." (Tr. 195).  Rainey stated that she could vacuum, do laundry, and plant, but she required breaks for all activities and needed help with laundry and planting. *Id.*

Rainey reported that she went outside every day it was warm and could get around by walking or riding a car. (Tr. 196).  She could not drive because her legs would get numb after prolonged sitting. *Id.*  Rainey stated that she could grocery shop up to twice per week but used the shopping cart to balance herself and would use benches for breaks. *Id.*  Rainey listed her hobbies as walking, playing computer games, and watching television, all of which she did for around 30 minutes before needing to stand, sit, or reposition herself. (Tr. 197).  Rainey reported that she visited her stepchildren twice per week and regularly visited flea markets. *Id.*

### E.    Relevant Testimonial Evidence

#### 1.    February 6, 2018 Hearing

At the February 6, 2018 ALJ hearing, Rainey testified that she could drive short distances. (Tr. 665).  After 20 minutes, she stated that she'd start experiencing shooting pains down her right leg and her foot would go numb. *Id.*  Rainey stated that the longest she could sit without issues was 30 minutes. (Tr. 666).  Rainey testified that she treated her back pain with a TENS unit, a hot pad, and soaking in a hot bath. (Tr. 666-67).  She stated that she was not attending physical therapy, but she walked around 30 minutes. (Tr. 667).

Rainey testified that she had carpal tunnel syndrome in both hands yet only received surgery on her right hand.  (Tr. 673).  Because the surgery did not provide her relief, she stated that she did not pursue surgical treatment on her other hand.  (Tr. 673-74).  Rainey stated that because of her carpal tunnel syndrome, her hands would go numb with constant use.  (Tr. 672, 687).

Rainey testified that her fibromyalgia primarily caused pain from her shoulders to her arms.  (Tr. 674-75).  She stated that it caused her skin to feel pain upon contact.  (Tr. 675). Rainey testified that she felt that her medication treatment had been helping and, although she was still in constant pain, the pain "eased up enough that I can tolerate it."  (Tr. 676).

Rainey's testimony of a typical day was consistent with her function report.  (Tr. 678-79, 682).  She testified that she took 20-minute breaks often when doing household chores.  (Tr. 679).  She'd have to take breaks after 15-20 minutes of standing.  (Tr. 684-85).  She testified that she could prepare meals that didn't require her to stand.  (Tr. 680).  She could climb stairs, but she found it difficult to do so.  *Id.*  Rainey testified that if she overworked herself one day, it'd be "very painful" to do tasks the next day.  (Tr. 684-85).  Rainey testified that she could stand for about 15 minutes at a time.  (Tr. 686).  And she could lift at most between 10-15 pounds.  *Id.*

Vocational expert ("VE") George Starosta testified that an individual with Rainey's age, education, and experience who was limited to light work with occasional stooping and climbing of ladders, ropes, and scaffolds could work as a laundry folder, cashier, and ticket taker.  (Tr. 688, 690).  The VE testified that employers generally would not tolerate regular absences, even if once per month.  (Tr. 691).  If the individual were absent consistent with Dr. Molaskey's opinion (two to four days per month), the VE testified there would be no competitive work for the individual.  *Id.*  If the individual had to take 20-minute breaks every 20 minutes of work, the VE

testified that would constitute off task behavior in excess of what an employer would tolerate. (Tr. 692-93).  And if the hypothetical at the light exertion level were restricted to occasional handling and fingering, the VE testified that the individual could perform "walking jobs," such as usher, gate guard, and greeter.  (Tr. 693-95).

### 2.    May 4, 2021 Hearing

Rainey's testimony at the May 4, 2021 is largely omitted because she testified to how her condition had progressed after the date last insured up to around the time of the ALJ hearing. *See* (Tr. 623-46).  Rainey expressed sitting, manipulation, standing, and bending limitations and break needs consistent with her previous testimony.  *See* (Tr. 625, 630-31, 636-38, 640).  She testified that in a typical workweek she'd feel like she could not get anything done between two and three days.  (Tr. 638-39).  And she could not say which of her functional limitations were specific to her fibromyalgia.  (Tr. 629-30).

VE Starosta testified that someone with Rainey's age, experience, and education and who was limited to light work with occasional balancing, stooping, kneeling, crouching, and crawling and never climbing ladders/ropes/scaffolds could perform work as a cashier, ticket taker, and laundry folder.  (Tr. 648-49).  If the individual were limited to 15-minute breaks after every 15 minutes of work, the VE testified there'd be no competitive work available, reiterating his previous testimony that it exceeded the maximum off-task time generally tolerated.  (Tr. 649). The VE also reiterated his testimony that employers would not tolerate regular absences.  (Tr. 650).

Before concluding, the ALJ noted that Dr. Molaskey's opinion effectively restricted Rainey to at most work at the sedentary exertion level, which would result in application of a medical-vocational allowance.  *Id.*; *see also* 20 C.F.R. pt. 404, Supt. P., App. 2 § 201.12.

14

### III.     Law & Analysis

#### A.     Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007).  "Substantial evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "It means – and means only – such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.* (quotation marks omitted).  Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. 2020) (quotation marks omitted).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.  *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 476 (6th Cir. 2003).  And "it is not necessary that this court agree with the Commissioner's findings," so long as it meets this low standard for evidentiary support.  *Rogers*, 486 F.3d at 241.  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right.").  And the court will not uphold a decision when the Commissioner's reasoning does "not build an accurate

and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked.").

### B.    Weighing of the Opinion Evidence

Rainey argues that the ALJ failed to apply proper legal standards when he failed to provide "good reasons" for affording "minimal weight" to Dr. Molaskey's opinion.  ECF Doc. 13 at 11-17.  Rainey argues that the gap between the date last insured and Dr. Molaskey's opinion was not a "good reason" because: (i) Dr. Molaskey began treating Rainey only two months after the date last insured; (ii) Dr. Molaskey's opinion on Rainey's lumbar spine condition related back to the relevant period; and (iii) it was not proper to discount Dr. Molaskey's opinion for having been rendered after the date Rainey was last insured since Dr. Fox's opinion – to which the ALJ gave "significant" weight – was also issued after the date last insured.  ECF Doc. 13 at 13-14.  Rainey argues that contrary to the ALJ's decision, Dr. Molaskey's opinion was not inconsistent with Dr. Byshenko's and Dr. Paylo's unremarkable objective exam findings because they also included findings of paraspinal muscle spasm, tenderness, positive straight leg test results, and pain with extension and rotation, such that the ALJ cherry picked one set of findings and ignored the other.  ECF Doc. 13 at 14-15.  Rainey argues that the ALJ made improper lay medical findings when he concluded that the imaging tests did not support a diagnosis of lumbar radiculopathy.  ECF Doc. 13 at 15-16.  Rainey argues that the ALJ's error was harmful because the ALJ instead gave weight to the contrary opinion of

16

a non-examining physician who did not have access to Rainey's carpal tunnel treatment notes at the time of her opinion. ECF Doc. 13 at 16-17.

The Commissioner disagrees, arguing that the nine-month gap between the date last insured and Dr. Molaskey's opinion was an adequate and sufficient reason to discount Dr. Molaskey's opinion. ECF Doc. 14 at 9-10. The Commissioner argues that the ALJ also reasonably determined that Dr. Molaskey's opinion was inconsistent with Dr. Byshenko's and Dr. Paylo's findings. ECF Doc. 14 at 10. The Commissioner argues that it was appropriate for the ALJ to credit Dr. Fox's opinion despite also being issued after the date last insured because her opinion was based on a review of medical records pertaining to the period under adjudication. ECF Doc. 14 at 10-11. And the Commissioner argues that the ALJ didn't cherry pick evidence or make improper medical findings but instead reasonably relied on the opinion of Dr. Fox. ECF Doc. 14 at 11-12.

At Step Four, an ALJ must weigh every medical opinion that the Social Security Administration receives. 20 C.F.R. § 404.1527(c). The regulations[5] in place at the time Rainey filed her application required the ALJ to give controlling weight to a treating physician's opinion unless he can articulate "good reasons" for discounting it. 20 C.F.R. § 404.1527(c); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013). Generally, "good reasons" include that the opinion: (1) wasn't "supported by medically acceptable clinical and laboratory diagnostic techniques"; or (2) was inconsistent with other medical evidence in the record. 20 C.F.R. § 404.1527(c)(2); *Biestek v. Comm'r of Soc. Sec.*, 880 F.3d 778, 786 (6th Cir. 2017).

---

[5] On January 18, 2017, the Social Security Administration amended the regulations for evaluating opinion evidence for claims filed after March 27, 2017. *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017). Because Rainey filed her claim in 2016, the previous regulatory framework applies to this case.

If the ALJ decides to discount a treating physician's opinion, he must then proceed to articulate what ultimate weight that opinion received based on several regulatory factors. *Gayheart*, 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2)-(6). Those factors include: (1) the length and frequency of treatment; (2) the supportability of the opinion; (3) the consistency of the opinion with the record as a whole; (4) whether the treating physician is a specialist; (5) the physician's understanding of the disability program and its evidentiary requirements; (6) the physician's familiarity with other information in the record; and (7) any other factor the ALJ might find relevant. *Gayheart*, 710 F.3d at 376; 20 C.F.R. § 404.1527(c)(2)-(6). The regulations don't require the ALJ to specifically discuss any particular factor. 20 C.F.R. § 404.1527(c); *Biestek*, 880 F.3d at 786 ("The ALJ need not perform an exhaustive, step-by-step analysis of each factor."). But if the ALJ's explanation isn't sufficient to explain the ultimate weight given to the opinion or otherwise fails to give "good reasons" for discounting the opinion, remand is appropriate. *Blakely v. Comm'r of Soc. Sec.*, 581 F.3d 399, 407 (6th Cir. 2009) (holding that the failure to identify good reasons affecting the weight given to an opinion "'denotes a lack of substantial evidence, even whe[n] the conclusion of the ALJ may be justified based upon the record.'" (citing *Rogers*, 486 F.3d at 243)).

The ALJ applied proper legal standards in evaluating Dr. Molaskey's opinion. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. The ALJ complied with the regulations by evaluating all of the opinion evidence and clearly stating the weight afforded to each. 20 C.F.R. § 404.1527(c), (f)(2); (Tr. 607-08). Contrary to Rainey's argument, the ALJ didn't have to provide "good reasons." For one, it is questionable whether the ALJ was required to give good reasons for giving less than controlling weight to Dr. Molaskey's opinion, given that her treatment relationship with Rainey did not begin until November 23, 2015 – after the date last insured. *See*

*Jirousek v. Comm'r of Soc. Sec.*, No. 1:16-cv-01221, 2017 U.S. Dist. LEXIS 72836, at *62 (N.D. Ohio May 12, 2017) ("Since there was no established treatment relationship prior to the date last insured, Jirousek has not demonstrated that Dr. Perhala's opinion would be entitled to controlling weight under the treating physician rule."); (Tr. 547).  More importantly, the ALJ rejected Dr. Molaskey's opinion initially because it did not relate back to the period under adjudication. (Tr. 608).  Binding precedent recognizes that opinion evidence postdating the date last insured is relevant only to the extent it relates back to the claimant's condition on or before the last insured date.  *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 850 (6th Cir. 2020).  And an opinion that doesn't relate back to the period under adjudication need not be assigned *any* weight.  *See Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 506 (6th Cir. 2013).

Substantial evidence supported the ALJ's conclusion that Dr. Molaskey's opinion did not relate back to the relevant time period, given that Dr. Molaskey rendered her opinion on June 29, 2016 – nine months after the date last insured – and did not state that her opinion reflected Rainey's degree of functioning as of the date last insured.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241; *see* (Tr. 463-65).  In some cases, the gap in time between the opinion and the date last insured will not undermine the relevance of the physician's opinion – such as when the physician had a treatment relationship with the claimant before the last insured date expired.  *Sito v. Comm'r of Soc. Sec.*, 229 F. Supp. 3d 633, 647 (N.D. Ohio 2017).  But here, the treatment relationship did even begin until after the date last insured, such that we are unable to conclude that Dr. Molaskey's opinion was relevant to Rainey's claim.  *Cf. Civitarese v. Comm'r of Soc. Sec.*, No. 1:19-cv-2015, 2020 U.S. Dist. LEXIS 135160, at * 58-59 (N.D. Ohio July 30, 2020) (concluding similarly with a one-month gap between the date last insured and the treatment relationship and a two-month gap with respect to the opinion).  Rainey has not explained how

Dr. Molaskey could have been aware of Rainey's condition from the prior period; and there is nothing in the record to indicate that Dr. Molaskey had access to Rainey's historical medical records.

That Dr. Fox's opinion was rendered after the date last insured did not undermine the validity of the gap in time as a basis for discounting Dr. Molaskey's opinion.  Unlike Dr. Molaskey, Dr. Fox expressly stated that her opinion reflected Rainey's degree of functioning during the period under adjudication.  (Tr. 87).  And we can independently verify the period of time Dr. Fox's opinion addressed because the medical record she reviewed to render her opinion was summarized in the Social Security Administration's initial disability determination.  *See* (Tr. 81-82, 87).

The ALJ's alternative analysis for determining the weight to assign to Dr. Molaskey's opinion also complied with the regulatory requirement that he articulate good reasons for giving the opinion "minimal weight."  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  The ALJ alternatively discounted Dr. Molaskey's opinion because: (i) her opinion that Rainey could not lift more than 10 pounds or perform work at even the sedentary exertion level was inconsistent with Dr. Byshenko's and Dr. Paylo's objective findings describing no neurological deficits or abnormalities in gait, station, and motor strength; and (ii) there was no evidentiary support in the record for her lumbar radiculopathy diagnosis.  (Tr. 608).  Both reasons together conveyed a general finding that Dr. Molaskey's opinion was inconsistent with other substantial evidence in the record, which is a "good reason" for discounting it.  20 C.F.R. § 404.1527(c)(2).  And the ALJ was "permitted to disregard the [Dr. Molaskey's] opinion regarding a diagnosis [when] such diagnosis is unsupported by any clinical findings or medical evidence."  *Talbert v. Astrue*, No.

12-140-DLB, 2013 U.S. Dist. LEXIS 116190, at *7 (E.D. Ky. Aug. 16, 2013) (citing *Cutlip v. Sec'y of Health and Hum. Servs.*, 25 F.3d 284, 286 (6th Cir. 1994)).

Substantial evidence also supported the ALJ's findings. 42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241. Substantial evidence supported the ALJ's finding that Dr. Molaskey's opinion was inconsistent with treatment notes from Dr. Byshenko and Dr. Paylo documenting no neurological deficits and no abnormal gait, station, and motor strength. *See* (Tr. 352-53, 356-57, 370, 382-83, 385-86, 388-89, 391-92, 394-97, 400-01. Rainey challenges this basis for rejecting Dr. Molaskey's opinion as cherry-picking because Dr. Byshenko and Dr. Paylo made objective findings consistent with Dr. Molaskey's opinion. The ALJ's discussion of the evidence noted the objective findings that Rainey argues by implication that the ALJ ignored. (Tr. 612); *see also Buckhanon ex rel. J.H. v. Astrue*, 368 F. App'x 674, 678-79 (7th Cir. 2010) ("[W]e read the ALJ's decision as a whole and with common sense."). The ALJ could reasonably rely on Dr. Byshenko's and Dr. Paylo's objective findings regarding Rainey's gait, station, motor strength, and neurological deficits to discount Dr. Molaskey's opinion on her ability to lift/carry, stand/walk, sit, reach, balance, crawl, push, and pull. It was not reversible error to resolve the inconsistency in the record unfavorably to Rainey's position. *Solembrino v. Astrue*, No. 1:10-CV-01017, 2011 U.S. Dist. LEXIS 58237, at *25 (N.D. Ohio May 27, 2011). And the ALJ was permitted to disregard objective findings in Dr. Molaskey's treatment notes after the date last insured. *See Emard*, 953 F.3d at 850.

The ALJ's finding that Dr. Molaskey's lumbar radiculopathy diagnosis was unsupported by the record was also supported by substantial evidence. The ALJ found that the diagnosis was inconsistent with imaging tests showing no stenosis or nerve root involvement. Put differently, the ALJ determined that the imaging tests which already had been interpreted by a physician

contained no interpretation that Rainey had lumbar radiculopathy. The ALJ's finding is supported by substantial evidence. (Tr. 368, 1082-84). The ALJ discounted the diagnosis on account of unremarkable neurological exam findings, which was also supported by substantial evidence. (Tr. 352-53, 356-57, 369-70, 391-92, 394-97, 400-01). And the ALJ's finding was consistent with the opinion of Dr. Fox, who observed that there was a lack of evidence suggesting "back pain with radiculopathy." (Tr. 87). Rainey challenges this basis for rejecting Dr. Molaskey's diagnosis as improper medical fact finding, but as noted above, the ALJ could permissibly reject a physician's diagnosis as unsupported so long as substantial evidence supported the ALJ's decision, which here it did. *Talbert*, No. 12-140-DLB, 2013 U.S. Dist. LEXIS 116190, at *7; *see also Rivera v. Comm'r of Soc. Sec.,* No. 1:13-CV-2162, 2014 U.S. Dist. LEXIS 121453, at *22-23 (N.D. Ohio Aug. 29, 2014).

Rainey appears to separately challenge the ALJ's reliance on Dr. Fox's opinion on the basis that Dr. Fox did not have before her the full record pertaining to Rainey's carpal tunnel syndrome. There is some truth to that, given that Horizon Greenville Orthopedics isn't mentioned among the sources of evidence in the Social Security Administration's initial decision. (Tr. 81-82). On the other hand, Dr. Fox's explanation for her findings discussed Rainey's carpal tunnel surgery. (Tr. 86-87). Regardless, an ALJ is permitted to rely on a state agency consultant's opinion even when it was based on a limited record if the ALJ considered the evidence the consultant did not, which was the case here *See McGrew v. Comm'r of Soc. Sec.*, 343 F. App'x 26, 32 (6th Cir. 2009); (Tr. 607).

Because the ALJ's reasons for discounting Dr. Molaskey's opinion were reasonably drawn from the evidence in the record and the ALJ complied with the regulations, the ALJ's decision to discount Dr. Molaskey's opinion fell within the Commissioner's "zone of choice."

*Mullen*, 800 F.2d at 545. And because the ALJ considered the evidence the state agency consultant did not in making his RFC findings, the ALJ could permissibly rely on Dr. Fox's opinion. Therefore, I find that Rainey has not established a basis for remand on account of the ALJ's weighing of the opinion evidence.

### C. Fibromyalgia

Rainey argues that the ALJ failed to apply proper legal standards in evaluating Rainey's subjective fibromyalgia pain symptoms by giving inadequate reasons for discounting them. ECF Doc. 13 at 17-20. Rainey argues that contrary to the ALJ's reasoning, she reported and received treatment for body pain before the date last insured. ECF Doc. 13 at 19. She argues that the ALJ also could not rely on the lack of objective findings to discount her subjective complaints, such that the ALJ failed to adhere to the district court's remand order. ECF Doc. 13 at 19-20.

The Commissioner responds that the ALJ correctly observed that there was an absence of recurrent subjective complaints related to fibromyalgia in the record. ECF Doc. 14 at 13. The Commissioner argues the ALJ did not solely rely on the lack of objective evidence to discount Rainey's subjective complaints and properly considered activities of daily living that supported his conclusion. ECF Doc. 14 at 13-14.

As stated above, at Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 404.1520(e). The RFC is an assessment of a claimant's ability to do work despite his impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) (citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p, 1996 SSR LEXIS 5 (July 2, 1996)). "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 1996 SSR LEXIS 5, at *14. And in the case of

fibromyalgia, the ALJ must "consider a longitudinal record whenever possible because the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'"  SSR 12-2p, 2012 SSR LEXIS 1, at *17 (July 25, 2012).

A claimant's subjective symptom complaints may support a disability finding only when objective medical evidence confirms the alleged severity of the symptoms. *Blankenship v. Bowen*, 874 F.2d 1116, 1123 (6th Cir. 1989).  This is more difficult in the case of fibromyalgia, which is characterized by the lack of "objectively alarming signs."  *Rogers*, 486 F.3d at 243; *see Swain v. Comm'r of Soc. Sec.*, 297 F. Supp. 2d 986, 990 (N.D. Ohio 2003) (noting that, due to the "elusive" and "mysterious" nature of fibromyalgia, medical evidence confirming the alleged severity of the impairment almost never exists).  Nevertheless, as with other impairments, the lack of corroborating medical evidence is not on its own dispositive of the severity of a claimant's impairments.  SSR 12-2p, 2012 SSR LEXIS 1, at *14; SSR 16-3p, 2016 SSR LEXIS 4, at *12-13.  In such cases, the ALJ must:

> consider all of the evidence in the record, including the person's daily activities, medications or other treatments the person uses, or has used, to alleviate symptoms; the nature and frequency of the person's attempts to obtain medical treatment for symptoms; and statements by other people about the person's symptoms.

SSR 12-2p, 2012 SSR LEXIS 1, at *14; *see also* SSR 16-3p, 2016 SSR LEXIS 4, at *18-19.

The ALJ failed to apply proper legal standards in evaluating Rainey's subjective fibromyalgia symptoms complaints.  42 U.S.C. § 405(g); *Rogers*, 486 F.3d at 241.  Relying on Rainey's testimony at the May 2021 hearing, the ALJ described Rainey's fibromyalgia symptoms as "vague skin pain and pressure points" or symptoms that Rainey was unable to differentiate from her back symptoms (*i.e.*, low back pain that radiated downwards that caused numbness).  (Tr. 606).  The ALJ stated that Rainey's fibromyalgia symptoms were adequately

24

accommodated by his RFC finding that Rainey was limited to light work with occasional

postural maneuvering and no climbing of ladders, ropes, or scaffolds.  (Tr. 608).  And in support,

the ALJ explained that:

> With respect to [Rainey's] fibromyalgia and back disorder, the medical record
> primarily documents complaints of low back pain with radiation into the bilateral
> lower extremities.  However, repeated lumbar imaging studies show only mild
> degenerative changes and minimal disc bulging at L2-3 and 3-4 without central or
> foraminal stenosis, or nerve root involvement (Exhibits B4F and B11F).
> Dr. Byshenko … found no acute distress, supple neck, normal gait and station,
> and no neurological deficits from January 2013 through March 2016 (Exhibit B5F
> and B6F).  Dr. Paylo, a pain management physician, describes a well appearance,
> no acute distress, lumbar tenderness, positive facet loading, normal gait and
> station, full cervical range of motion, and intact strength and sensations in all
> extremities from June 2015 through October 2015 (Exhibit B4F).  While [Rainey]
> testified to vague fibromyalgia pain, review of systems are negative for fatigue
> and the medical record is devoid of recurrent subjective complaints, focused
> treatment, and clinical abnormalities such as tender points relative to this
> condition through the date last insured.  In addition, [Rainey] endorsed only low
> back and lower extremity pain in a March 2016 Function Report (Exhibit B3E).
> Moreover, [Rainey] first sought treatment with a rheumatologist and exhibited
> diffuse fibromyalgia tender points in September 2018, which is three years after
> the date last insured (Exhibit B11F).  Notably, Dr. Hassan, the examining
> rheumatologist, also observed a good musculoskeletal range or disorganization of
> motion, 5/5 motor strength, and no neurological deficits (*Id.*).  At the hearing,
> [Rainey] acknowledged that prescribed medications are helpful for pain.
>
> In considering the absence of recurrent subjective complains relative to
> fibromyalgia, imaging studies that reveal only mild degenerative changes, and
> longitudinal clinical findings that consistently show normal gait, station, and
> neurological functioning through the date last insured, the evidence of record fails
> to support the severity for the claimant's allegations.

(Tr. 607-08).  Effectively, the ALJ discounted Rainey's subjective symptom complaints because:

(i) she did not regularly report fibromyalgia symptoms to providers during the period under

adjudication; (ii) she testified that her symptoms were alleviated by medication; (iii) her

symptoms were inconsistent with objective exam findings; and (iv) she did not seek treatment

specifically for her fibromyalgia until 2018.

The ALJ's analysis is flawed because it failed to build an accurate and logical bridge between the evidence and the result. *Fleischer*, 774 F. Supp. 2d at 877. The ALJ's analysis reads as if the ALJ was unsure what Rainey's fibromyalgia symptoms were. He began his analysis by discounting both Rainey's back and fibromyalgia pain based on objective exam findings and then proceeded to analyze her fibromyalgia as it if were separate and distinct from her back disorder. It's hard to square that analysis with the ALJ's summary of the hearing testimony, in which the ALJ stated that Rainey was "unable to differentiate the fibromyalgia from the back symptoms." If, as the ALJ stated, Rainey's fibromyalgia symptoms could not be readily distinguished from her back pain, then her statements to her providers reporting back would constitute "recurrent subjective complaints" of fibromyalgia symptoms and her statement in her function report that she suffered low back and extremity pain would be consistent with her symptom complaints. *See* (Tr. 193, 279, 283, 287, 355, 368-69, 391 394-96, 400). The record shows that Rainey sought treatment for her back pain during the period under adjudication and objective exam findings corroborated her symptom complains of low back pain. *See* (Tr. 355, 359, 362, 365, 368, 391, 394, 396, 400); *see also* (Tr. 356, 370 (positive facet loadings tests, tender lumbar and sacroiliac joints, and painful flexion of the lumbar spine)). And relief with medication would not be inconsistent with Rainey's testimony that, even with medication, she had to take breaks after 20 minutes of activity or alternate positions after 20 minutes of walking, sitting, or standing. (Tr. 630-33, 637-38).

Even excluding Rainey's back pain as related to her fibromyalgia, Rainey testified that her fibromyalgia symptoms manifested as pain to touch in her shoulders and arms. (Tr. 674-75). She reported upper extremity pain to Dr. Byshenko and Dr. Rogers and "diffuse whole body pain secondary to FMS" to Dr. Paylo. (Tr. 269, 278-79, 368 394). And she described limitations

associated with her shoulder pain in her function report.  (Tr. 193) ("Can't' lift heavy items for long period[s] of time (pain in neck + shoulder area when holding and lifting objects)").  That Rainey didn't report symptoms with greater regularity would not undermine her subjective symptom complaints because "the symptoms of [fibromyalgia] can wax and wane so that a person may have 'bad days and good days.'"  SSR 12-2p, 2012 SSR LEXIS 1, at *17.

The ALJ's finding that Rainey didn't seek treatment specifically for fibromyalgia during the period under adjudication was not entirely accurate.  Before the alleged onset date, Rainey received treatment for her leg pain and fibromyalgia from the same provider.  (Tr. 746-47).  She continued to see a pain specialist during the period under adjudication, though treatment notes from that provider were not made part of the record.  (Tr. 274, 276, 288).  And Dr. Rogers and Dr. Byshenko provided Cymbalta and baclofen, which were used to treat Rainey's fibromyalgia, during the period under adjudication.  (Tr. 265, 396-97, 427).  Further, a lack of objective exam findings corroborating the severity of a claimant's fibromyalgia symptoms, upon which the ALJ relied heavily, is "basically irrelevant" and so is the lack of "aggressive" treatment.  *Kalmbach v. Comm'r of Soc. Sec.*, 409 F. App'x 852, 864 (6th Cir. 2011).

The above discussion illustrates the analytical difficulties that arise when analyzing the severity of fibromyalgia.  An ALJ needs to go "beyond objective medical evidence" and more meaningfully engage with the claimant's subjective symptom complaints.  *See Swain*, 297 F. Supp. 2d at 990, 994.  The ALJ's ultimate conclusion that no greater functional limitations were warranted might ultimately be supported by substantial evidence, but that conclusion doesn't logically follow from the ALJ's analysis.  Thus, I find that a remand is warranted for the ALJ to reconsider Rainey's subjective symptom complaints regarding her fibromyalgia.  *Fleischer*, 774 F. Supp. 2d at 877.

## IV.    Recommendation

Because the ALJ failed to apply proper legal standards in analyzing Rainey's subjective fibromyalgia pain symptoms, I recommend that the Commissioner's final decision denying Rainey's application for DIB be vacated and that Rainey's case be remanded for further consideration.

Dated: April 29, 2022

Thomas M. Parker
United States Magistrate Judge

---

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party may serve and file specific written objections to the proposed findings and recommendations of the magistrate judge.  Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28 U.S.C.§ 636(b)(1); Local Rule 72.3(b).  Properly asserted objections shall be reviewed de novo by the assigned district judge.

\* \* \*

Failure to file objections within the specified time may result in the forfeiture or waiver of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the United States Court of Appeals, depending on how or whether the party responds to the report and recommendation.  *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019).  Objections must be specific and not merely indicate a general objection to the entirety of the report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991).  Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 U.S. Dist. LEXIS 100383, \*6 (W.D. Ky. June 15, 2018) (quoting *Howard*).  The failure to assert specific objections may in rare cases be excused in the interest of justice.  *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).